1  Timothy Chandler, CA Bar No. 234325
   ALLIANCE DEFENSE FUND
2  101 Parkshore Drive, Suite 100
   Folsom, CA 95630
3  Tele: (916) 932-2850; Fax: (916) 932-2951
   tchandler@telladf.org
4
   David A. Cortman, GA Bar No.188810*
5  Joshua B. Bolinger, OH Bar No. 0079594
   ALLIANCE DEFENSE FUND
6  1000 Hurricane Shoals Road, NE
   Building D, Suite 600
7  Lawrenceville, GA 30043
   Tele: (770) 339-0774; Fax: (770) 339-6744
8  dcortman@telladf.org
   jbolinger@telladf.org
9
   Benjamin W. Bull, AZ Bar No. 009940
10 Jeremy D. Tedesco, AZ Bar No. 0234847*
   ALLIANCE DEFENSE FUND
11 15100 N. 90th Street
   Scottsdale, AZ 85260
12 Tele: (480) 388-8051; Fax: (480) 444-0028
   bbull@telladf.org
13 jtedesco@telladf.org

14 *Motion to permit appearance *pro hac vice* submitted concurrently

15 Attorneys for Plaintiff

16

17

18

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

19 P.A., a minor by and through her next friend,   )   CASE NO.
   N.A.                                            )   C08    00242
20                                                 )
        Plaintiff,                                 )
21                                                 )
   v.                                              )
22                                                 )
   DIANE GORDON, MATTHEW DEAN,                     )   PLAINTIFF'S NOTICE OF, AND
23 MARGIE MITCHELL, PAM PARKER, and                )   MOTION FOR, PRELIMINARY
   ROYCE PETERSON, all individually and in        )   INJUNCTION AND MEMORANDUM
24 their official capacities as Members of the     )   OF POINTS AND AUTHORITIES
   Campbell Union High School District Board       )
25 of Trustees; RHONDA FARBER, in her              )   Note on Calender for: February 29, 2008,
   individual capacity and in her official capacity)   at 9:30 a.m.
26 as Superintendent of the Campbell Union High    )
   School District; and OWEN HEGE, in his         )
27 individual capacity and in his official capacity )
   as Principal of Westmont High School,           )
28                                                 )
        Defendants.                                )

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

Filed

JAN 1 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . 5

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  STATEMENT OF ISSUES TO BE DECIDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. STATEMENT OF RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   A.   STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . 13

   B.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIMS . . . . . . . . . 13

      1.   DEFENDANTS' POLICIES AND PRACTICE VIOLATE THE EAA . . . . . . . . . . 13

         a.   Defendants Created a Limited Open Forum Triggering the EAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         b.   Defendants' Refusal to Give the Students of the Pro-Life Club the Same Benefits as Students of Other Clubs Violates the EAA . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      2.   DEFENDANTS ARE VIOLATING THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         a.   Plaintiff's Speech is Protected by the First Amendment

         b.   Defendants Have Created a Designated Public Forum for Speech by Student Groups . . . . . . . . . . . . . . . . . . . . . . 17

         c.   Defendants' Content-Based Exclusion of Plaintiff From the Student Organization Forum Violates Her Free Speech Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         d.   Defendants' Viewpoint-Based Exclusion of Plaintiff From the Student Organization Forum Violates the First Amendment Regardless of the Type of Forum . . . . . . . . . . . . 19

   C.   PLAINTIFF IS SUFFERING IRREPARABLE HARM . . . . . . . . . . . . . . . . . . . . . . . 21

   D.   PLAINTIFF RAISES SERIOUS QUESTIONS OF LAW AND THE BALANCE OF

1          HARDSHIPS TIPS SHARPLY IN HER FAVOR . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2    E.    GRANTING EQUAL ACCESS TO PLAINTIFF SERVES THE PUBLIC INTEREST . . . . . . 23

3    F.    DEFENDANTS HAVE NO JUSTIFICATION FOR DENYING EQUAL ACCESS . . . . . . . . 23

4 V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5                    **TABLE OF AUTHORITIES**

6    Cases                                                                          Pages

7    *Bernhardt v. County of Los Angeles*, 339 F.3d 920 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 13

8    *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226 (1990) . . . . . . . . . . . . . . passim

9    *Boyd Cty. High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd Cty., KY,*

10        258 F.Supp.2d 667 (E.D. KY. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11   *Brown v. California Dep't of Transp.*, 321 F.3d 1217 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . 13

12   *Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

13   *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) . . . . . . . . . . . 17,24,25

14   *Chalk v. United States Dist. Ct.*, 840 F.2d 701 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 13

15   *Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. School Dist.,*

16        386 F.3d 514 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,19

17   *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five,*

18        470 F.3d 1062 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

19   *City of Atlanta v. Metropolitan Atlanta Rapid Transit Auth.,*

20        636 F.2d 1084 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21   *Colin v. Orange Unified Sch. Dist.*, 83 F.Supp.2d 1135 (C.D. Cal. 2000) . . . . . . . . . . . . . . 15

22   *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,*

23        473 U.S. 788 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18,19

24   *Doctor John's, Inc. v. City of Sioux City*, 305 F.Supp.2d 1022 (N.D. Iowa 2004) . . . . . . . . . . . 6

25   *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211 (3d Cir. 2003) . . . . . . . . . . . . . . . 7,24

26   *Elam Constr., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343 (10th Cir.1997) . . . . . . . . . . . . . 23

27   *Elrod v. Burns*, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28   *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 17

1   *Homans v. Albuquerque*, 264 F.3d 1240 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2   *Iowa Right to Life Comm'e, Inc. v. Williams*, 187 F.3d 963 (8th Cir.1999) . . . . . . . . . . . . . . . 23

3   *Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4   *Newsom ex rel. Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) . . . . . . . 22

5   *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92 (1972) . . . . . . . . . . . . . . . . . . . . . . . . 18

6   *Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244 (3d Cir. 1993) . . . . . . . . . . . . . . . . . 8,15

7   *Prince v. Jacoby*, 303 F.3d 1074 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

8   *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

9   *Rosenberger v. Rectors and Visitors of the University of Virginia*,

10      515 U.S. 819 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . 13,21,23

12  *Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . 6

13  *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-Dist. No. 279*,

14      471 F.3d 908 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,16,22

15  *Suster v. Marshall*, 149 F.3d 523 (6th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

16  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) . . . . . . . . . . . . . . . . . . . . 6,7

17  *Westfield High School L.I.F.E. Club v. City of Westfield*,

18      249 F.Supp.2d 98 (D.Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,23

19  *Widmar v. Vincent*, 454 U.S. 263 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,17,18,19

20  **Statutes**

21  20 U.S.C. § 4071, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,9,14

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

TO EACH PARTY AND THEIR ATTORNEYS OF RECORD: Please take notice that on February 29, 2008, at 9:30 a.m., or as soon thereafter as this matter can be heard, Plaintiff, by and through counsel, will appear before the United States District Court for the Northern District of California, San Jose Division, located at 280 South 1st Street, San Jose, CA 95113, for a hearing on her preliminary injunction motion now brought to enjoin Campbell Union High School District Board Members Diane Gordon, Matthew Dean, Margie Mitchell, Pam Parker, and Royce Peterson, District Superintendent Rhonda Farber, and Owen Hege, Principal of Westmont High School (collectively "Defendants"), from continuing to violate the Equal Access Act, 20 U.S.C. §§ 4071-74 (1984), as well as the First and Fourteenth Amendments to the United States Constitution.

This Motion is brought pursuant to Federal Rule of Civil Procedure 65 (a) and Civil L.R. 7.1 and 7.2 to prevent further irreparable harm to Plaintiff's rights during the pendency of this litigation. The harm to Plaintiff's rights stems from Defendants' ongoing refusal to provide equal access to Plaintiff's student club, presently named "Live Action" (hereinafter "Pro-Life Club"). Plaintiff moves this Court to order Defendants to grant Plaintiff all of the rights, benefits, and privileges given to other students of recognized clubs at Westmont High School ("WHS"). In addition, Plaintiff requests that this Court enjoin Defendants' Policies and practice that permit Defendants to censor student club speech based on the content and viewpoint of that speech.

Absent such relief, Plaintiff will continue to suffer irreparable injury to her statutory and constitutional rights to express her religious views at WHS. Indeed, for each day that passes where Plaintiff is denied access to *all* of the rights and benefits given to students of other recognized clubs, she is prevented from expressing her religious and political views through all available communicative avenues. The irreparable harm Plaintiff experiences cannot be discontinued absent preliminary injunctive relief from this Court.

Plaintiff also asks this Court to waive any requirement of bond. *See, e.g., Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F.Supp.2d 98, 128-29 (D.Mass. 2003) (waiving bond requirement in case involving student Bible club seeking a preliminary injunction where "requiring a security bond. . . might deter others from exercising their constitutional rights"); *City of Atlanta*

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    *v. Metropolitan Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (upholding waiver

2    of bond requirement where "[i]n a real sense . . . plaintiffs were engaged in public-interest litigation,

3    an area in which the courts have recognized an exception to the Rule 65 security requirement");

4    *Doctor John's, Inc. v. City of Sioux City*, 305 F.Supp.2d 1022, 1043-44 (N.D. Iowa 2004)

5    ("Requiring a bond to issue before enjoining potentially unconstitutional conduct . . . simply seems

6    inappropriate, because the rights potentially impinged by the governmental entity's actions are of

7    such gravity that protection of those rights should not be contingent upon an ability to pay").

8                          **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.    INTRODUCTION**

10            Defendants' actions in this case strike at the heart of statutory and constitutional protections

11    that have been afforded to public school students for decades, and undermine the spirit of open

12    discourse essential to public education in a democratic republic. *See, e.g., Tinker v. Des Moines*

13    *Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) ("The Nation's future depends upon leaders

14    trained through wide exposure to that robust exchange of ideas which discovers the truth 'out of a

15    multitude of tongues, (rather) than through any kind of authoritative selection'"); *Shanley v.*

16    *Northeast Indep. Sch. Dist.*, 462 F. 2d 960, 972 (5th Cir. 1972) ("[T]he purpose of education is to

17    spread, not to stifle, ideas and views"). Rather than promoting the exchange of ideas, views, and

18    beliefs, Defendants trample upon Plaintiff's private religious and political expression because of

19    disagreement with her message, thereby shirking their duties of equal treatment imposed by the

20    Federal Equal Access Act ("EAA") and the United States Constitution.

21            The degree to which the Defendants disregard their statutory and constitutional duties – and

22    thus stamp out Plaintiff's religious and political views – is quite remarkable and cannot be

23    understated, for she is *literally silenced* in every way imaginable at her school. (Ex. C, Plf's Aff.

24    ¶17.) Not only is she denied equal access to communicative avenues, such as the morning

25    announcements and school bulletin boards (as addressed in §§ III and IV, *infra*)), Defendants

26    demand that Plaintiff not even *mention the existence* of the Club to anyone else because it is

27    allegedly "too controversial." Consequently, while Plaintiff's Club is technically permitted to meet

28

1  by Defendants on campus, it is in a very real sense completely prevented from even functioning as

2  a student club because every available communicative avenue is cut off from them.

3       Defendants' attempt to justify this discriminatory treatment by claiming that Plaintiff's Pro-

4  Life Club is simply "too controversial," (Compl. ¶¶71, 76, 109; Ex. C ¶18), teeters on the edge of

5  frivolity, for it is well-established that excluding a group from a forum "simply because it is

6  controversial or divisive is viewpoint discrimination," and necessarily unlawful. *Child Evangelism*

7  *Fellowship of New Jersey, Inc. v. Stafford Twp. School Dist.*, 386 F.3d 514, 527-28 (3d Cir. 2004).

8  Even in the public school setting, "a mere desire to avoid the discomfort and unpleasantness that

9  always accompany an unpopular viewpoint" fails to justify the suppression of speech. *Tinker*, 393

10  U.S. at 509. Defendants' viewpoint-based discrimination is also evident when one stops to inquire

11  whether other student clubs on campus that discuss "controversial" issues – such as the Gay Straight

12  Alliance – are denied equal access to benefits in the same manner as Plaintiff's Club. The answer

13  is "no." Only Plaintiff's Club is singled out for disparate treatment.[1]

14       This discriminatory treatment indicates a two-tiered scheme implemented by the Defendants

15  that violates both the EAA and the First Amendment. The facts clearly show that the Defendants

16  have established a public forum for expression by clubs on virtually limitless topics. In doing so,

17  the law requires them to provide Plaintiff's Pro-Life Club the exact same access to school facilities

18  and benefits as they provide to other recognized student groups. *See* 20 U.S.C. § 4071, *et seq.*

19  (requiring schools to provide "equal access" to all aspects of school's limited open forum); *Bd. of*

20  *Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226 (1990) (holding that EAA required school

21  to grant Bible club access to same benefits provided to other students clubs); *Prince v. Jacoby*, 303

22  F.3d 1074 (9th Cir. 2002) (same); *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F. 3d 211 (3d Cir.

23  2003) (same); *Widmar v. Vincent*, 454 U.S. 263 (1981) (First Amendment required university to

24  provide religious student group equal access to all benefits received by other student groups).

25

26

---

27  [1]Moreover, if Defendants' standard is that "controversial" clubs are denied equal access, while clubs deemed by them not to be "controversial" are given all benefits, etc., this standard in and

28  of itself is an unconstitutional restriction granting unbridled discretion to Defendants to discriminate against Plaintiff's religious and political speech. *See* Compl. ¶¶ 135-141.

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    Moreover, it is well-settled law that Defendants may not sidestep the requirements of the

2  EAA by providing *some* access, but not *equal* access, as they attempt to do here. While Defendants

3  technically allow the Club to meet on campus, they insist on foreclosing every single communicative

4  avenue available to her. Defendants apparently believe that allowing the club to meet on campus

5  is all that the EAA requires. They are plainly mistaken. "This same situation presented itself in

6  *Mergens*, in which the Court held that the defendant school district violated the Act by not affording

7  *equal* access." *Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244, 1248 n.4 (3d Cir. 1993)

8  (emphasis in original) (finding a violation of the EAA where the Bible Club was permitted to meet,

9  but denied the right to utilize the public address system, bulletin boards, and other privileges

10  accorded to nonreligious groups); *see also, Prince*, 303 F.3d at 1077 (where the Bible club was

11  permitted to meet as a separate category club, the court held "that the School District violated . . . the

12  [EAA] . . . by denying her Bible club the *same* rights and benefits as other School District student

13  clubs and by refusing to allow the Bible club equal access to school facilities on a religion-neutral

14  basis") (emphasis added); *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-Dist. No.*

15  *279*, 471 F.3d 908, 912 (8th Cir. 2006) ("[The school] does not prohibit SAGE from meeting at the

16  school or utilizing some avenues of communication; however, the issue is not whether SAGE has

17  access to some avenues of communication but whether it has equal access to the same avenues of

18  communication as other noncurriculum related groups. We hold that it does not").

19    In sum, *Mergens*, *Prince*, and other cases on point show that this is not an arduous case. The

20  EAA and the First Amendment condemn Defendants' discriminatory treatment of Plaintiff and her

21  Club. Rather than complying with their statutory and constitutional duties, Defendants here prohibit

22  Plaintiff from expressing her religious and political views concerning abortion, abstinence, and many

23  other issues that recognized student clubs are permitted to address based solely on the religious and

24  political content and viewpoint of her desired speech. Defendants' content- and viewpoint- based

25  discrimination is blatantly unconstitutional and must be enjoined.

26  **II.   STATEMENT OF ISSUES TO BE DECIDED**

27    Whether Defendants' Policies and practice related to student club formation, both facially

28  and as applied to Plaintiff's religious and political speech, violate the Equal Access Act, 20 U.S.C.

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1 §§ 4071-74 (1984), and the First and Fourteenth Amendments to the United States Constitution.

2 **III.    STATEMENT OF RELEVANT FACTS**

3        Plaintiff P.A., a minor, is a resident of Campbell, California and a student at Westmont High

4 School. (Compl. ¶18.) N.A., next friend, is P.A.'s parent and guardian, and at all times relevant to

5 this Complaint, is a resident of Campbell, California. (*Id.* ¶24.)

6        Defendants Diane Gordon, Matthew Dean, Margie Mitchell, Pam Parker, and Royce Peterson

7 are Members of the Campbell Union High School District Board of Trustees and are sued both

8 individually and in their official capacities. (*Id.* ¶¶25-29.) These five Defendants (collectively

9 "Board") are responsible for the enactment, enforcement, and existence of policies and practices

10 related to the rights, benefits, and privileges afforded to student clubs at WHS. (*Id.* ¶30.) The Board

11 bears responsibility for denying Plaintiff's Club the same rights, benefits, and privileges given to

12 other student clubs at the school pursuant to its policies and practice. (*Id.* ¶31.) The Board is

13 likewise responsible for the implementation and application by the Superintendent and Principal of

14 its policies and practices pertaining to student clubs. (*Id.* ¶32.) In addition, the Board is charged

15 with delegating to the Superintendent and Principal final authority as to the official recognition of

16 student clubs. (*Id.* ¶33.) Moreover, the Board acquiesced in and approved of Defendant Farber's

17 denial of Plaintiff's request to form a pro-life club. (*Id.* ¶34.)

18        Defendant Rhonda Farber is the Superintendent of the Campbell Union High School District.

19 (*Id.* ¶35.) Defendant Farber possesses responsibility, final authority, and discretion, as delegated by

20 the Board, as to the administration of Board policies as they relate to student activities on campus.

21 (*Id.* ¶36.) Defendant Farber also has responsibility, final authority, and discretion, as delegated by

22 the Board, as to the administration of Board policies related to the establishment of student clubs,

23 as well as the benefits said clubs receive. (*Id.* ¶37.) In this capacity, Defendant Farber possesses

24 final supervisory responsibility over the Principal of WHS. (*Id.* ¶38.) Defendant Farber bears

25 responsibility for the Policies and practice leading to the denial of equal benefits to Plaintiff's Club,

26 as well as for the denial itself. (*Id.* ¶¶39-40.) Defendant Farber instructed Defendant Hege to deny

27 Plaintiff's request to form her Pro-Life Club. (*Id.* ¶41.) Defendant Farber is sued both in her

28 individual capacity and in her official capacity as Superintendent of the District. (*Id.* ¶42.).

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    Defendant Owen Hege is the Principal of WHS and is charged with its administration,

2    including Board-delegated responsibility, authority, and discretion as to enforcement of Board

3    policies relating to student clubs. (*Id.* ¶¶43-44.) Defendant Hege is responsible for the Policies and

4    practice leading to the denial of equal benefits to Plaintiff's Club, as well as for the denial itself. (*Id.*

5    ¶¶45-46.) Defendant Hege made the decision to deny equal benefits to Plaintiff's Club pursuant to

6    the Policy and practice implementation and direction of the Board. (*Id.* ¶48.) This decision by

7    Defendant Hege to deny equal benefits and privileges to Plaintiff's Club was made at the direction

8    of the Superintendent and of the Board. (*Id.* ¶49.) Defendant Hege is sued both in his individual

9    capacity and in his official capacity. (*Id.* ¶47.)

10    <u>WHS and the Student Club Forum Created and Implemented by the Defendants</u>

11    WHS is a public high school located in Campbell, California and is under the direction of

12    the Board. (*Id.* ¶¶50-51.) WHS includes grades 9 through 12 and is classified as a secondary school

13    under California law. (*Id.* ¶52.) Upon information and belief, both WHS and the Board receive

14    federal financial assistance. (*Id.* ¶53.)

15    The Board, acting through Defendants Farber and Hege, as Superintendent and Principal,

16    respectively, grant official club status to non-curriculum related student clubs. (*Id.* ¶54.) Acting

17    through Defendants Farber and Hege, the Board allows said clubs to meet on school premises at

18    WHS during non-instructional time. (*Id.* ¶55.) Non-curriculum related clubs currently recognized

19    by the Board include, among others, the Gay Straight Alliance; B-Buoy (break dancing); Chess

20    Club; Sci-Fi/Horror Movie Club; Running Club; Key Club; Culture Club; Link Crew; Color Talk;

21    Christian Club; and Invisible Children. (*Id.* ¶56.) These clubs address issues involving, among

22    others, promoting respect, dignity, and safety for students at WHS; premarital sex, including

23    homosexual behavior; community service and involvement; leadership; supporting freshman facing

24    difficult decisions and/or situations; appreciation of cultural identity; equality of, and respect for, all

25    human life regardless of color; faith and religion; and various human rights issues. (*Id.* ¶57.)

26    Participation in such clubs is neither required nor directly encouraged by WHS faculty in connection

27    with curriculum course work. (*Id.* ¶¶58-59.)

28    Defendants, pursuant to their Policies and practice, permit officially recognized

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1   non-curriculum related clubs to (i) conduct meetings during non-instructional time on campus; (ii)

2   utilize morning public address announcements to convey information about any upcoming club

3   meetings or planned activities to the student body; (iii) use space on school bulletin boards to display

4   information about any upcoming club activities and/or meetings; (iv) advertise club activities and

5   meetings through respectful and non-disruptive flyer distribution activities on WHS grounds during

6   non-instructional time; (v) have a descriptive club name of their own choosing, so that the club may

7   adequately convey its purpose and ideals to interested students; (vi) have their club name and a

8   description of the club listed on the WHS website; and (vii) announce Club meetings and/or

9   activities on the WHS "Daily Bulletin," via the school's website.  (*Id.* at ¶¶60-66.)

10      <u>Plaintiff and Her Pro-Life Club</u>

11          Plaintiff is an adherent of the Christian faith and desires to share her religious and political

12  views and beliefs with her classmates. (*Id.* ¶19.) Pursuant to her sincerely held religious beliefs,

13  Plaintiff desires to meet with other students through the Pro-Life Club at WHS. (*Id.* ¶20.) Plaintiff

14  believes in the sanctity of life and that abstinence is the best way to avoid unwanted pregnancies.

15  (*Id.* ¶21.) Plaintiff also desires to reach out to her peers and to offer them love, advice, assistance,

16  education, and service based on her religious and political beliefs and opinions. (*Id.* ¶22.)  In

17  addition, Plaintiff desires to fellowship together with other students and to discuss relevant issues

18  facing students including, among others, faith and religion; community service; personal

19  responsibility; leadership; assisting underclassmen faced with difficult choices and/or situations;

20  sexual abstinence; keeping and raising children in the event of pregnancy; human rights issues;

21  promoting respect toward others; and equality of, and respect for, all human life. (*Id.* ¶23.)

22      <u>Defendants Deny Plaintiff and Her Pro-Life Club Equal Access to the Student Club Forum</u>

23          In October, 2007, Plaintiff, pursuant to her sincerely held religious and political beliefs,

24  submitted a written request to Defendants requesting to start the Pro-Life Club at WHS. (*Id.* ¶67.)

25  Plaintiff requested that her Club to be granted official club status, with all attendant rights, benefits,

26  and privileges. (*Id.* ¶68.) Plaintiff also asked that the Club be named the "Live Action – Pro-Life

27  Club." (*Id.* ¶69.)

28          In response to Plaintiff's request, Defendants proceeded to technically permit Plaintiff and

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1  other Club members to meet during non-instructional time, but denied (and continue to deny)

2  Plaintiff and fellow Club members any avenue through which they might tell other students about

3  the Club. (*Id.* ¶70.) For example, Defendants prohibit Plaintiff from even telling other students at

4  WHS about the Club's existence, let alone the Club's intended pro-life message, for the stated reason

5  that it is "too controversial." (*Id.* ¶71.) Defendants also bar Plaintiff access to morning P.A.

6  announcements and access to school bulletin boards, prevent Plaintiff from distributing flyers,

7  prohibit Plaintiff from selecting a club name, bar Plaintiff from using the term "pro-life" in the club

8  name, prohibit Plaintiff from listing the Club on the WHS website, and proscribe Plaintiff from

9  announcing Club meetings and activities on the WHS "Daily Bulletin." (*Id.* ¶¶72-78.) Incredibly,

10  Defendants even refused to provide Plaintiff with information regarding any policies, guidelines, or

11  procedures related to student clubs even though she requested such information. (*Id.* ¶79.)

12      Acting pursuant to their Policies and practice, Defendants have denied equal access to the

13  above described rights, benefits, and privileges because of the religious and political nature and

14  speech of the Club. (*Id.* ¶80.) This denial of equal access—whether pursuant to the Board's Policies

15  regarding formation of student clubs, or pursuant to Defendants Farber's and Hege's final decision-

16  making authority over student club requests—violates and continues to violate Plaintiff's

17  constitutional and statutory rights. (*Id.* ¶¶ 30-34; 36-41; 44-49.) Plaintiff desires to express her

18  religious at political views at WHS as soon as possible without facing discipline. (Ex. C. ¶30.)

19  **IV.    ARGUMENT**

20      It is firmly established that the Equal Access Act and the First Amendment prohibit public

21  school officials from discriminating against the content and viewpoint of a student club's speech and

22  that of its members. Yet, that is precisely what Defendants are guilty of here. Defendants would

23  grant Plaintiff's Pro-Life Club all of the benefits and privileges given to other student clubs but for

24  the religious and political content of Plaintiff's desired speech. This illicit censorship and denial of

25  equal access should not be permitted to continue. A preliminary injunction must issue to end the

26  Defendants' blatant content- and viewpoint- based discrimination against Plaintiff's speech.

27      We turn initially to Plaintiff's demonstrated satisfaction of the necessary elements for an

28  injunction to issue (*see* §§ IV(A) through (E), *infra*), then close by rebutting any feeble attempt by

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    Defendants to justify their discrimination (*see* §IV(F), *infra*).

2    **A.    STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION**

3        This Court may issue a preliminary injunction when the movant demonstates either (1) a

4    combination of probable success on the merits and the possibility of irreparable harm; or (2) that

5    serious questions are raised and the balance of hardships tips in the movant's favor. *Brown v.*

6    *California Dep't of Transp.*, 321 F.3d 1217, 1221 (9th Cir. 2003). "Each of these two formulations

7    requires an examination of both the potential merits of the asserted claims and the harm or hardships

8    faced by the parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002).

9    These two formulations represent "two points on a sliding scale in which the required degree of

10   irreparable harm increases as the probability of success decreases." *Id.* (citation omitted.)

11   Additionally, "[i]f the public interest may be affected by the proposed injunction, it should also be

12   factored into the analysis." *Bernhardt v. County of Los Angeles*, 339 F.3d 920, 925 (9th Cir. 2003).

13       Usually, a preliminary injunction "preserve[s] the *status quo* pending a final determination

14   of the action on the merits." *Chalk v. United States Dist. Ct.*, 840 F.2d 701, 704 (9th Cir. 1988). But

15   it is entirely appropriate to alter the *status quo* to protect a party from irreparable harm. *See, e.g.*,

16   *Brown*, 321 F.3d 1217 (issuing a preliminary injunction and altering the *status quo* where a

17   plaintiff's First Amendment rights were violated). Here, Plaintiff seeks a limited, temporary

18   alteration of the *status quo* to protect her from further irreparable harm to her speech, equal access,

19   and equal protection rights resulting from Defendants' ongoing discrimination. As shown below,

20   Plaintiff satisfies each element necessary for an injunction to issue.

21   **B.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIMS**

22       Defendants' practice of denying equal access to student members of clubs based on the

23   content and viewpoint of the student's desired speech (pursuant to Policies granting them unbridled

24   discretion over access to the student club forum) implicate a host of constitutional provisions,

25   including the Free Speech Clause of the First Amendment and the EAA. As to each of her claims,

26   Plaintiff demonstrates a clear likelihood of success.

27   **1.    DEFENDANTS' POLICIES AND PRACTICE VIOLATE THE EAA.**

28       Defendants violate the EAA and well-settled precedent in withholding rights and benefits

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1   afforded members of other student clubs based on the religious content of Plaintiff's desired speech.

2   *See* 20 U.S.C. § 4071, *et seq.* (public schools are required to provide equal access to limited open

3   fora irrespective of religious, political, or other content of student speech); *Mergens*, 496 U.S. at 247

4   ("Given that the Act explicitly prohibits denial of equal access . . . on the basis of the religious

5   content of the speech at [club] meetings . . . we hold that [the school district's] denial of respondents'

6   request [for official recognition of their] Christian club denies them "equal access" under the Act")

7   (citation omitted); *Prince*, 303 F.3d at 1077 ("the School District violated . . . the Act . . . by denying

8   [the plaintiff's] Bible club the same rights and benefits as other School District student clubs and by

9   refusing to allow the Bible club equal access to school facilities on a religion-neutral basis"). Again,

10  (and as described fully in §III, *supra*) these rights and benefits include access to school bulletins

11  boards, the P.A. system, and flyer distribution efforts, among others. As shown below, Defendants

12  triggered the EAA. The equality mandated by the Act requires Defendants to provide all of the same

13  rights and benefits afforded students of other recognized clubs.

14              a.      **Defendants Created a Limited Open Forum Triggering the EAA.**

15          The EAA provides that "[i]t shall be unlawful for any public secondary school which

16  receives federal financial assistance and which has a limited open forum to deny equal access or a

17  fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that

18  limited open forum on the basis of the religious, political, philosophical, or other content of the

19  speech at such meetings." *Mergens*, 496 U.S. at 235 (quoting 20 U.S.C. § 4071(a)). The first two

20  requirements for the EAA to apply are met in this case: WHS is a public secondary school under

21  California law and it receives federal financial assistance. (Compl. ¶¶50-53; 86-87.)

22          The third requirement triggering the EAA is also met. Defendants have created a limited

23  open forum. The Act dictates that a school has a limited open forum "whenever such school grants

24  an offering to or opportunity for one or more noncurriculum related student groups to meet on school

25  premises during noninstructional time." 20 U.S.C. § 4071(b). When making this determination, the

26  Supreme Court gives the EAA "[a] broad reading . . . consistent with the views of those who sought

27  to end discrimination by allowing students to meet and discuss religion." *Mergens*, 496 U.S. at 239.

28          Defendants grant official club status to numerous clubs that are non-curriculum related,

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

14

1  including the Gay Straight Alliance, B-Buoy, Chess Club, Sci-Fi/Horror Movie Club, Key Club,

2  Culture Club, Link Crew, Color Talk, Christian Club, and Anime Club, just to name a few. (Compl.

3  ¶¶7, 56; Ex. C ¶8; Ex. A at 1-2 (providing a non-exhaustive list of recognized student clubs at WHS

4  and including a description of each).) While WHS has, at a minimum, twenty non-curriculum

5  related clubs, only *one* is needed to trigger the EAA. *See Mergens*, 496 U.S. at 235-240 ("[E]ven

6  if a public secondary school allows only one 'noncurriculum related student group' to meet, the

7  Act's obligations are triggered and the school may not deny other clubs, on the basis of the content

8  of their speech, equal access to meet on school premises during noninstructional time"). For a club

9  to be "curriculum related," it must be directly tied to a class. *Id.* at 239 ("[T]he term 'noncurriculum

10 related student group' is best interpreted broadly to mean any student group that does not directly

11 relate to the body of courses offered by the school"). "For example, a French club would directly

12 relate to the curriculum if a school taught French in a regularly offered course or planned to offer

13 the subject in the future." *Id.* at 240. *None* of the recognized school clubs listed above are directly

14 related to the "body of courses offered at [WHS]" like the French club in *Mergens. Id.*

15        Further, Defendants have granted official recognition (and accompanying benefits) to two

16 student clubs—Key Club and the Gay Straight Alliance—that other federal courts have determined

17 to be non-curriculum related clubs, thus triggering the EAA. In *Pope*, the Third Circuit Court of

18 Appeals held that a Key Club was a non-curriculum club. 12 F.3d at 1251-54. The *Pope* Court

19 found that the Key Club was non-curriculum related despite the fact that the defendant school district

20 taught a unit on "homelessness, hunger, and poverty" in its History and Humanities class, and

21 required students in the class to participate in and coordinate several of the Key Club's community

22 service projects. *Id.* at 1252. Similarly, in *Colin v. Orange Unified Sch. Dist.*, 83 F.Supp.2d 1135,

23 1143-44 (C.D. Cal. 2000), the Central District held that both a Key Club and a Gay Straight Alliance

24 were non-curriculum related. And, in *Boyd Cty. High Sch. Gay Straight Alliance v. Bd. of Educ. of*

25 *Boyd Cty., KY*, another federal district court held that a Gay Straight Alliance to be unrelated to a

26 school's curriculum. 258 F.Supp.2d 667, 687, 693 (E.D. KY. 2003) ("Defendants must give the

27 [Gay-Straight Alliance] Club and its members equal access to those activities of student groups

28 permitted at [the school] and not directly related to the curriculum . . ."). Defendants' grant of

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1  official recognition to the Key Club and the Gay Straight Alliance triggers the EAA in this matter

2  because both of these clubs (in addition to the others at WHS) are non-curriculum related.

3      **b.    Defendants' Refusal to Give the Students of the Pro-Life Club the Same Benefits as Students of Other Clubs Violates the EAA.**

4      "Equal access" under the EAA requires public schools to provide the *same* rights and benefits

5  to students of all non-curriculum related clubs, not merely *some* of the benefits. Equal means just

6  that. As addressed *supra*, federal courts, including the Supreme Court, have so held. For example,

7  in *Mergens*, 496 U.S. at 226, the defendant school district technically allowed a religious club to

8  meet on campus (as Defendants allow here). But, the school district refused to provide the student

9  members all of the rights and benefits given to student members of other non-curriculum related

10 clubs because of the religious content of the club's speech (again, as here). The Court held that the

11 school district violated the club's right to "equal access" under the EAA both by denying the club

12 access to rights and benefits of recognition, including "access to the School newspaper, bulletin

13 boards, the public address system, and the annual Club Fair." *Id.* at 247. *See also, Prince*, 303 F.3d

14 at 1077 (where Bible club was permitted to meet but denied the same benefits of other clubs, the

15 court held that EAA required the club to have equal access to yearbook appearance, use of student

16 club funds, and access to the public address system and bulletin boards, since these same benefits

17 were afforded to secular student clubs); *SAGE*, 471 F.3d at 912 (when a student club was permitted

18 to meet on campus but denied communicative avenues afforded other groups, EAA not satisfied).

19     Defendants are denying the students of the Pro-Life Club the rights and benefits afforded

20 student members of other recognized student clubs based solely on the religious content and

21 viewpoint of Plaintiff's desired speech. It is clear that such blatant discrimination against student

22 speech is prohibited by the EAA. Plaintiff's likelihood of success of her statutory claim is clear.

23     **2.    DEFENDANTS ARE VIOLATING THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT.**

24

25     In addition to violating the EAA, Defendants ongoing denial to Plaintiff of equal club rights,

26 benefits, and privileges violates her First Amendment rights.

27

28

1

        **a.**    **Plaintiff's Speech is Protected by the First Amendment.**

2

     Religious speech is indisputably protected by the First Amendment. *Widmar*, 454 U.S. at

3

269 ("religious worship and discussion . . . are forms of speech and association protected by the First

4

Amendment"). As the Supreme Court has explained:

5

> Our precedent establishes that private religious speech, far from being a First
> Amendment orphan, is as fully protected under the Free Speech Clause as secular

6

> private expression. . . . [I]n Anglo-American history . . . government suppression of
> speech has so commonly been directed precisely at religious speech that a

7

> free-speech clause without religion would be Hamlet without the prince.

8

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (citations omitted).

9

Plaintiff's political speech is also entitled to the full protection of the First Amendment. *Buckley v.*

10

*Valeo*, 424 U.S. 1, 14 (1976) (citation omitted) ("The First Amendment affords the broadest

11

protection to . . . political expression . . . "); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992)

12

("Core political speech occupies the highest, most protected position" under the First Amendment).

13

Here, Plaintiff desires to express her religious and political views on a whole host of subject matters

14

already being discussed by student clubs at WHS. (Compl. ¶¶23, 57, 90, 94, 105 ; Ex. C. ¶¶20-30.)

15

Plaintiff's speech is clearly protected by the First Amendment.

16

        **b.**    **Defendants Have Created a Designated Public Forum for Speech**
                **by Student Groups.**

17

18

     Designated public forums are created by the government for use by the public as places for

19

expressive activity. "[A] public forum may be created by government designation of a place or

20

channel of communication . . . for assembly and speech, for use by certain speakers, or for the

21

discussion of certain subjects." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473

22

U.S. 788, 802 (1985). Importantly, the Supreme Court has held that school facilities become public

23

forums when "school authorities have 'by policy or by practice' opened those facilities 'for

24

indiscriminate use by the general public,' or by some segment of the public, such as student

25

organizations." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citation omitted).

26

     Government intent is the central question in determining whether a designated public forum

27

has been established. *Cornelius*, 473 U.S. at 802. Under Supreme Court precedent, the

28

government's "policy and practice" are the key to determining whether the government "intended

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1  to designate a place not traditionally open to assembly and debate as a public forum." *Id.* The

2  example of a government-created designated forum the Supreme Court relied on in *Cornelius* is

3  particularly apt to the case here, since that case involved a student organization forum:

4  > For example, in *Widmar v. Vincent*, 454 U.S. 263, 102 S. Ct. 269, 70 L. Ed. 2d 440
5  > (1981), we found that a state university that had an express policy of making its
   > meeting facilities available to registered student groups had created a public forum
6  > for their use. *Id.*, at 267, 102 S. Ct., at 273. The policy evidenced a clear intent to
   > create a public forum . . . .

7  *Cornelius*, 473 U.S. at 802.  The Ninth Circuit similarly held in *Prince*, 303 F. 3d at 1090-91, that

8  a public high school's provision of meeting facilities and various benefits, rights, and privileges to

9  student organizations created a designated public forum for student speech.

10     The student organization forums in *Widmar* and *Prince* are indistinguishable from the student

11  club forum created by Defendants.  Here, Defendants' Policies and practice "evince[] a clear intent

12  to create a public forum." *Id.*  Defendants impose virtually no limit on the subject matters that may

13  be addressed by students, other than the individual interests, passions, and beliefs of the students

14  who seek to establish such clubs.  Indeed, Defendants recognize student clubs, such as the Gay

15  Straight Alliance, Link Crew, Key Club, and Christian Club, and Invisible Children, where the

16  members take various views on a number of issues. (Compl. ¶¶56, 90, 105; Ex. C. ¶¶21, 23, 25, 27.)

17  Defendants' forum is plainly a designated forum for private student speech.

18          **c.**    **Defendants' Content-Based Exclusion of Plaintiff From the
   Student Organization Forum Violates her Free Speech Rights.**

19

20     In a designated public forum, content-based restrictions on speech are subject to strict

21  scrutiny, and can survive only if they serve a compelling state interest and are narrowly tailored to

22  achieve that interest. *Widmar*, 454 U.S. at 270.  The Defendants' exclusion of Plaintiff's Pro-Life

23  Club based on the religious and political content of her desired speech violates the First Amendment.

24  In *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), the Supreme Court held that

25  > government may not grant the use of a forum to people whose views it finds
   > acceptable, but deny use to those wishing to express less favored or more
26  > controversial views.  And it may not select which issues are worth discussing or
   > debating in public facilities.  There is an 'equality of status in the field of ideas,' and
27  > government must afford all points of view an equal opportunity to be heard.  Once
   > a forum is opened up to assembly or speaking by some groups, government may not
28  > prohibit others from assembling or speaking on the basis of what they intend to say.
   > Selective exclusions from a public forum may not be based on content alone, and
   > may not be justified by reference to content alone.

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1   Defendants' discrimination against the Pro-Life Club's intended political and religious

2   speech (*see* Compl. ¶¶ 93, 94, 105) (specifying the intended political and religious content of the

3   Club's meetings and activities) is no different than the discriminatory exclusion struck down in

4   *Widmar*. There, the defendant university, like Defendants here, opened up its facilities for use by

5   student organizations, yet excluded a religious student club from that forum because, like the

6   Plaintiff's Club here, it engaged in religious activity and discussion. 454 U.S. at 265. The Supreme

7   Court found that the university's "discriminatory exclusion [was] based on the religious content of

8   [the] group's intended speech," and thus required the university to "show that its regulation is

9   necessary to serve a compelling interest and that it is narrowly tailored to achieve that end." *Id.* at

10  269-70. The Defendants here have also aimed their discrimination at Plaintiff's desired political

11  speech, by denying equal benefits to Plaintiff's Club based on her intent to express her political

12  views regarding abortion. (Compl. ¶71, 76, 105-106.) In *Widmar*, the university's content-based

13  discrimination could not withstand strict scrutiny, and neither can the Defendants' discrimination

14  against the Plaintiff's religious and political speech here.

15          **d.      Defendants' Viewpoint-Based Exclusion of Plaintiff from the
                      Student Organization Forum Violates the First Amendment**
16          **Regardless of the Type of Forum.**

17          When the government denies a speaker access to a speech forum based solely on the

18  viewpoint that speaker expresses on an otherwise permissible subject matter, viewpoint

19  discrimination occurs. *Cornelius*, 473 U.S. at 812 (cautioning that "the purported concern to avoid

20  controversy excited by particular groups may conceal a bias against the viewpoint advanced by the

21  excluded speakers"). Viewpoint discrimination is "prohibited in all forums." *Child Evangelism*

22  *Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 n.4 (4th Cir. 2006). Indeed,

23  federal courts have found schools guilty of viewpoint discrimination under similar circumstances.

24  *See, e.g., Child Evangelism Fellowship of New Jersey, Inc.*, 386 F.3d at 527-28 ("To exclude a group

25  [from access to the school setting] simply because it is controversial or divisive is viewpoint

26  discrimination"); *Prince*, 303 F.3d at 1074, 1091-92 (where school district offered non-curriculum

27  clubs access to "student/staff time, school supplies, AV equipment, and school vehicles to convey

28  their club messages," but denied the same access to a student Bible club, such exclusion was "based

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    purely on the [club's] religious viewpoint in violation of the First Amendment"); *Donovan*, 336 F.

2    3d at 226 ("[The Bible Club] is a group that discusses current issues from a biblical perspective, and

3    school officials denied the club equal access to meet on school premises during the activity period

4    solely because of the club's religious nature.  Accordingly, we hold that the exclusion constitutes

5    viewpoint discrimination"); *Rosenberger v. Rectors and Visitors of the University of Virginia*, 515

6    U.S. 819, 828-833 (1995) (holding that university's denial of funding to student group amounted to

7    impermissible viewpoint discrimination where the denial was premised on the ground that the

8    contents of the group's publication revealed an avowed religious perspective).

9        Defendants' actions here are indistinguishable from the unlawful actions of the school

10    officials in the above cases.  Similar to the groups there, Plaintiff seeks to express her religious and

11    political views regarding subject matters permitted to be discussed within the WHS student

12    organization forum.  Other students address topics such as premarital sex, including homosexual

13    behavior (*e.g.*, Gay Straight Alliance), community service , leadership, and a focus on the spiritual,

14    rather than material, values of life (*e.g.*, Key Club), promoting respect, dignity, and tolerance toward

15    others (*e.g.*, Gay Straight Alliance), helping freshmen with difficult decisions and/or situations (*e.g.*,

16    Link Crew), faith and religion, including daily living of the Golden Rule (*e.g.*, Christian Club and

17    Key Club); and embracing different cultures and lifestyles (*e.g.*, Culture Club, Christian Club, and

18    the Gay Straight Alliance) (Compl. ¶¶57, 90; Exs. A at 1-2 (listing many student clubs at WHS

19    along with a description of their "main purpose"); D at 1 ("Gay-Straight Alliances (GSAs) are

20    student-led clubs . . . that work to address anti-LGBT name-calling, bullying and harassment in the

21    schools and promote respect for ALL students"); E at 1 ("Key Club . . . is a student-led organization

22    that teaches leadership through serving others"); E at 2 (listing among the Key Club "Objects" to

23    "give primacy to the human and spiritual, rather than to the material values of life," and to

24    "encourage the daily living of the Golden Rule in all human relationships"); F at 3("Before their 9[th]

25    grade year begins, new students are introduced to the school, to its academic and support programs

26    and to campus life by sophomores as a part of the Link Crew Program); G at 2 ("[WHS] has many

27    . . . student clubs that embrace the different cultures and lifestyles of our student body – such

28    as . . . Culture Club, Christian Club, and the Gay-Straight Alliance . . . . [T]hese clubs . . . provide

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1   positive experiences, teach tolerance, and improve student relations and Westmont's atmosphere");

2   Plaintiff desires to speak to these issues from a religious perspective, but is kept from doing so by

3   Defendants' viewpoint discrimination. (Compl. ¶¶93, 94, 107-110; Ex. C. ¶¶22, 24, 26, 28-30.)

4          In addition, Defendants' stated justification for their refusal of equal benefits (*i.e.* that the

5   Pro-Life Club is "too controversial") is implausible given the facts of this case and clearly shows

6   illicit viewpoint discrimination. As noted at the outset of this Memorandum, at least one non-

7   curriculum, the Gay Straight Alliance, is afforded equal treatment despite the fact that it discusses

8   and deals with controversial issues. Defendants cannot credibly explicate how the Gay Straight

9   Alliance is not controversial in nature, but that the Pro-Life Club is. Indeed, the *only* explanation

10  for this unequal treatment is the Defendants' viewpoint- based discrimination against Plaintiff.

11  **C.    PLAINTIFF IS SUFFERING IRREPARABLE HARM**

12         It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods

13  of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74

14  (1976); *see also, SAGE*, 471 F.3d at 913 (8th Cir. 2006) ("[T]he . . . presumption of irreparable harm

15  arises in the case of violations of the Equal Access Act because it protects expressive liberties")

16  (quotation and citation omitted). In this Circuit, "a party seeking preliminary injunctive relief in a

17  First Amendment context can establish irreparable injury sufficient to merit the grant of relief by

18  demonstrating the existence of a colorable First Amendment claim." *Sammartano*, 303 F.3d at 973.

19         Plaintiff has much more than a colorable claim here, as shown above. Defendants continue

20  to prohibit Plaintiff and her Club from obtaining equal access to rights and benefits received by other

21  student clubs. This violates her rights under both the First Amendment and the EAA, and the harm

22  to these rights is ongoing. For each day that passes where Plaintiff is not permitted to form her Pro-

23  Life Club, and to express her religious and political views at WHS, she is experiencing irreparable

24  harm. There is no money or other compensation that can replace Plaintiff's lost speech.

25         Relevant also as to the issue of irreparable harm is the Eight Circuit's discussion in *SAGE*

26  given that case's factual similarities to this instant matter:

27             [A]lthough [the school] has afforded students the opportunity to hold SAGE
               meetings in school classrooms and place posters on a community bulletin board
28             outside the meeting place, they have not, like student members of [other
               noncurriculum groups], been allowed to communicate via the PA, yearbook, and

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1   scrolling screen. Additionally, the students have been prohibited from holding
    fundraising events or having field trips. Therefore, the student members of SAGE
2   are entitled to a presumption of irreparable harm, as they will not be able to exercise
    their rights absent a preliminary injunction.
3

4   *SAGE*, 471 F.3d at 913 (emphasis added). Just as in *SAGE*, Plaintiff has shown here that she is

5   technically permitted to meet with other Club members on campus, but is denied access to all of the

6   communicative avenues given to other student clubs. This showing entitles Plaintiff to a

7   presumption of irreparable harm, as she cannot exercise her rights absent injunctive relief.

8   **D.    PLAINTIFF RAISES SERIOUS QUESTIONS OF LAW AND THE BALANCE OF
           HARDSHIPS TIPS SHARPLY IN HER FAVOR.**

9        As set forth above, the issues presented by the facts of this case present grave constitutional

10  concerns, and the overwhelming weight of the law as applied to those facts favors Plaintiff. It is

11  beyond cavil to suggest that Plaintiff has not satisfied the requirement of serious questions going to

12  the merits. If not allowed access to all student club rights, benefits, and privileges, Plaintiff and her

13  fellow Club members will continue to suffer religious discrimination and will continue to be second-

14  class citizens within the student forum community. (Ex. C. ¶¶29-30.)

15       In addition, the balance of hardships tips decidedly in Plaintiff's favor. Plaintiff's loss would

16  perpetuate actions by Defendants violative of the EAA and the First Amendment, while Defendants'

17  "gain" would be peripheral and token, at best. *See, e.g., Mitchell v. Cuomo*, 748 F.2d 804, 807-08

18  (2d Cir. 1984) ("Faced with . . . a conflict between the state's . . . administrative concerns on the one

19  hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty

20  concluding that . . . the balance of hardships tips decidedly in plaintiffs' favor"); *Newsom ex rel.*

21  *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (noting that a public

22  school "is in no way harmed by issuance of a preliminary injunction which prevents it from

23  enforcing a regulation, which . . . is likely to be found unconstitutional"). Indeed, Defendants

24  already recognize many non-curriculum related student clubs at WHS, permitting students to speak

25  about many subjects. (Compl. ¶¶57, 90.) Plaintiff merely desires to address these topics from her

26  religious point of view. (*Id.* ¶¶ 93, 94, 105; Ex. C. ¶¶22, 24, 26, 28, 30.) Injunctive relief would

27  simply require Defendants to treat members of the Club the same as members of other clubs.

28

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    **E.    GRANTING EQUAL ACCESS TO PLAINTIFF SERVES THE PUBLIC INTEREST**

2        In this case, the public interest would be served by applying binding, well-established

3    Supreme Court and Ninth Circuit authority to require Defendants to cease discriminating against

4    Plaintiff and to ensure that she is treated equally.  In this Circuit, "[t]he public interest inquiry

5    primarily addresses impact on non-parties rather than parties." *Sammartano*, 303 F.3d at 974.  In

6    its *Sammartano* decision, the Ninth Circuit highlighted the following authority, among others, for

7    the proposition that federal courts "considering requests for preliminary injunctions have

8    consistently recognized the significant public interest in upholding First Amendment principles":

9        See *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir.2001) ("[W]e believe
         that the public interest is better served by following Supreme Court
10       precedent and protecting the core First Amendment right of political expression.");
         *Iowa Right to Life Comm'e, Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir.1999)
11       (finding a district court did not abuse its discretion in granting a preliminary
         injunction because "the potential harm to independent expression and certainty in
12       public discussion of issues is great and the public interest favors protecting core
         First Amendment freedoms"); *Suster v. Marshall*, 149 F.3d 523, 530 (6th Cir.1998)
13       (holding candidates for judicial office were entitled to preliminary injunction of
         expenditure limit given likelihood of success on the merits, irreparable harm and
14       lack of public interest in enforcing a law that curtailed political speech); *Elam
         Constr., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir.1997) . . . .
15
16   303 F.3d at 974.  Here, the public has no interest in seeing ongoing enforcement of Defendants'

17   blatantly unlawful Policies and practice to squelch First Amendment and EAA freedoms, and every

18   interest in seeing Plaintiff's rights protected.  *See, e.g., Westfield High School L.I.F.E. Club*, 249

19   F.Supp.2d at 128-29 ("[T]he public interest is served when public high school students seek to

20   preserve their rights to free expression and free exercise of religion").

21   **F.    DEFENDANTS HAVE NO JUSTIFICATION FOR DENYING EQUAL ACCESS.**

22       To the extent the Defendants attempt to justify their denial of equal benefits for the reason

23   that the Pro-Life Club is "too controversial," this argument would be a sham under the facts of this

24   case.  As explained *supra*, at least one non-curriculum club, the Gay Straight Alliance, is afforded

25   equal treatment despite the fact that it discusses controversial issues.  There is simply no conceivable

26   way for the Defendants to explain how the Gay Straight Alliance is not controversial, while at the

27   same time classifying the Pro-Life Club as such.  Indeed, the *only* explanation for this disparate

28   treatment is Defendants' content- and viewpoint- based discrimination against Plaintiff's speech.

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

1    Moreover, if the Defendants argue that they are justified in excluding Plaintiff's Pro-Life

2    Club from the student club forum to avoid the appearance of violating the Establishment Clause, this

3    argument too should fail under the facts of this case.    The Defendants have already granted

4    recognition to a religious club – the Christian Club. (Compl. ¶7; Exs. C. ¶8; G. at 2.)  Because the

5    Defendants did not view granting recognition to the Christian Club as posing any Establishment

6    Clause problems, then neither does granting recognition to Plaintiff's religious club.

7        Of course, it is also well-settled law that the Establishment Clause does not justify the

8    exclusion of religious speakers from private speech fora, like the student club forum at issue here.

9    The Supreme Court and several other federal courts have repeatedly rejected the argument that the

10   Establishment Clause justifies exclusion of religious speakers in the context of the EAA and First

11   Amendment speech fora.  For instance, in *Mergens*, the Court held constitutional the EAA's

12   requirement that a school grant equal access to a religious student club.  As the Court put it,

13         there is a crucial difference between government speech endorsing religion, which
           the Establishment Clause forbids, and private speech endorsing religion, which the
14         Free Speech and Free Exercise Clauses protect. We think that secondary school
           students are mature enough . . . to understand that a school does not endorse or
15         support student speech that it merely permits on a nondiscriminatory basis.

16   *Mergens*, 496 U.S. at 250; *accord Prince*, 303 F. 3d at 1092 ("It does not violate the Establishment

17   Clause for a public [school] to grant access to its facilities on a religion-neutral basis to a wide

18   spectrum of student groups, including groups that use meeting rooms for sectarian activities,

19   accompanied by some devotional exercises.") (quoting *Rosenberger*, 515 U.S. at 842)); *Donovan*,

20   336 F. 3d at 227 (same).

21       Outside the EAA context, the Supreme Court has repeatedly come to the same conclusion.

22   In *Widmar*, a case involving a student organization speech forum similar to the forum involved here,

23   the Supreme Court explained that where a forum is available to a broad class of speakers, allowing

24   religious speech "*does not confer any imprimatur of state approval on religious sects or practices*."

25   454 U.S. at 274 (emphasis added).  The *Pinette* Court reaffirmed this holding:

26         We have twice previously addressed the combination of private religious expression,
           a forum available for public use, content-based regulation, and a State's interest in
27         complying with the Establishment Clause. Both times, we have struck down the
           restriction on religious content. . . . And as a matter of Establishment Clause
28

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

24

jurisprudence, we have consistently held that it is no violation for government to enact neutral policies that happen to benefit religion.

515 U.S. at 762, 763-64. Neutral accommodation of religious activity does not violate the Establishment Clause, and providing a neutral government benefit *upholds* the Constitution.

## V.    CONCLUSION

In a post-*Mergens*, post-*Prince* world, Defendants lack a valid excuse for their failure to provide equal access to Plaintiff and her Club. Justice requires that Defendants' discrimination against Plaintiff be enjoined during the pendency of this litigation, thereby affording Plaintiff and her Club equal access to all rights, benefits and privileges obtained by other clubs at WHS.

Dated this *10th* day of January, 2008.

Respectfully submitted,

David A. Cortman, GA Bar No.188810*
*Lead Counsel*
Joshua B. Bolinger, OH Bar No. 0079594*
ALLIANCE DEFENSE FUND
1000 Hurricane Shoals Road, NE
Building D, Suite 600
Lawrenceville, GA 30043
Tele: (770) 339-0774; Fax: (770) 339-6744
dcortman@telladf.org
jbolinger@telladf.org

Benjamin W. Bull, AZ Bar No. 009940
Jeremy D. Tedesco, AZ Bar No. 0234847*
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, AZ 85260
Tele: (480) 388-8051; Fax: (480) 444-0028
bbull@telladf.org
jtedesco@telladf.org

Timothy Chandler, CA Bar No. 234325
*Local Counsel*
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, CA 95630
Tele: (916) 932-2850; Fax: (916) 932-2951
tchandler@telladf.org

*Motion to permit appearance *pro hac vice*
submitted concurrently

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certified that a copy of the foregoing Plaintiff's Notice of, and Motion for, Preliminary Injunction and Memorandum of Points and Authorities will be served upon all Defendants to this action by manner of personal service, along with the Verified Complaint.

Dated this *10th* day of January, 2008.

Timothy Chandler, CA Bar No. 234325
ALLIANCE DEFENSE FUND

PLF'S NOTICE, MTN, & MEMO, SUPPORT OF P.I.

25

1

## EXHIBITS TABLE OF CONTENTS

2

P.A., minor by and through her next friend, N.A.,

3

v.

4

Diane Gordon, *et al.*

5

Northern District of California, San Jose Division

6

**Exhibits:**

7    Exhibit A    Listing of student clubs at Westmont High School ("WHS")

8    Exhibit B    WHS "Daily Bulletin" for Friday, December 21, 2007

9    Exhibit C    Affidavit of Plaintiff, P.A.

10    Exhibit D    Gay, Lesbian and Straight Education Network (GLSEN) FAQs about student Gay Straight Alliance clubs

11

Exhibit E    Key Club documents

12

Exhibit F    Excerpt from WHS Accountability Report for 2004-05 describing Link Crew

13

Exhibit G    Excerpt from WHS Parent Teacher Student Association (PTSA) newsletter describing several student clubs and their purposes

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS TABLE OF CONTENTS

# EXHIBIT A

# Westmont High School

| Student Club's | Club Advisor | Club's Main Focus |
|---|---|---|
| Art Club | Matsui | Art |
| Art Commission | Chuchill | Art |
| Asian Student Union | Yang | Racial equality |
| Band | Naylor | Music |
| B-Buoy | Primmer | Break dancing |
| Black Student Union | Matsui | Racial equality |
| Chess Club | Hjalmarson | Chess |
| Color Talk | LaBouff | Racial equality |
| CSF | Heinrichsen | Community Service |
| CSF | Walton | Community Service |
| Culture Club | Okita | 'Cultural identity |
| Drama | Bengford | Theatre |
| Drama (assistant) | Lasater | Theatre |
| Ecology Club | Gaston | Environmental progress |
| FFA | Duarte | The future of agriculture |
| French Club | Waclawek | The French language its cultrue |
| Gay Straight Alliance | Atton | Student safety |
| Homework Center | Pina | A place to complete homework |
| International Night | Murillo | Cultural identity |
| International Night | Weaver | Cultural identity |
| Intramurals | Santos | Sports |
| Invisible Children | Chuchill | Suffering children in Uganda |
| Journalism | Evans | Media publications |
| JROTC | Cross | Service to country |
| Key Club | Toews | Community Service |
| Link Crew | Tighe | Support for freshmen |
|  | Figueroa | Human rights |
| Mecha | Cooke | Racial equality |
| Project Cornerstone | Wallace | Progress at Westmont |

Exhibit A - 1

| Red Cross Club | Wyss | Volunteering for health and safety |
| Running Club | Fujita | Running |
| Sci-Fi/Horror Movie | Mansfield | The horror/sci-fi movie genre |
| Spanish Club | Parks | The Spanish language and its culture |
| Speech and Debate | Pinza | Public speaking |
| Speech and Debate | Roberts | Public speaking |
| Technology | Earhart | Computers |
| Video Editing | Bowen | Morning announcements |
| Yearbook | Jarrett | Creation of the yearbook |

Exhibit A - 2

# EXHIBIT B

The Westmont High School  Daily Bulletin                                      Page 1 of 1

# The Westmont High

# School 

### Daily Bulletin

Student Edition                                                    Friday
December 21, 2007 B-Day

**TODAYS? SPORTS:**
* Boys Soccer Vs Santa Teresa at Santa Teresa 3:15 release players at 1:15

**TODAYS? MEETINGS:**
* Anime Club at lunch in room 34, we will be electing club officers. See you there.  (Ms. Cruz)
* Color Talk today at lunch in room 29. Hope to see you there!"  (Ms. LaBouff)

**CSF/HONOR ROLL CLUB MEMBERS** Remember our Fresh Choice Nights are the Monday, Tuesday and Wednesday when we return.  Get your community service done over the break... all points are due Friday, January 11th, NO EXCEPTIONS! (Mrs. Heinrichsen)

**ATTENTION STUDENTS:**  If you l have not picked up your senior panoramic photo! Please come by and pick them up today. (Mr. Kolda)

# EXHIBIT C

1   Timothy Chandler, CA Bar No. 234325
      ALLIANCE DEFENSE FUND
2   101 Parkshore Drive, Suite 100
      Folsom, CA 95630
3   Tele: (916) 932-2850; Fax: (916) 932-2951
      tchandler@telladf.org
4
      David A. Cortman, GA Bar No.188810*
5   Joshua B. Bolinger, OH Bar No. 0079594*
      ALLIANCE DEFENSE FUND
6   1000 Hurricane Shoals Road, NE
      Building D, Suite 600
7   Lawrenceville, GA 30043
      Tele: (770) 339-0774; Fax: (770) 339-6744
8   dcortman@telladf.org
      jbolinger@telladf.org
9
      Benjamin W. Bull, AZ Bar No. 009940
10  Jeremy D. Tedesco, AZ Bar No. 0234847*
      ALLIANCE DEFENSE FUND
11  15100 N. 90th Street
      Scottsdale, AZ 85260
12  Tele: (480) 388-8051; Fax: (480) 444-0028
      bbull@telladf.org
13  jtedesco@telladf.org

14  *Motion to permit appearance *pro hac vice* submitted concurrently

15  Attorneys for Plaintiff

16
                 **UNITED STATES DISTRICT COURT**
17      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN JOSE DIVISION**
18
      P.A., a minor by and through her next friend,  )
19  N.A.                                 )   CASE NO.
                                     )
20        Plaintiff,               )
                                     )
21  v.                                  )
                                   )
22  DIANE GORDON, MATTHEW DEAN,     )   AFFIDAVIT OF P.A. IN SUPPORT
      MARGIE MITCHELL, PAM PARKER, and  )   OF PLAINTIFF'S MOTION FOR
23  ROYCE PETERSON, all individually and in  )   PRELIMINARY INJUNCTION
      their official capacities as Members of the   )
24  Campbell Union High School District Board  )
      of Trustees; RHONDA FARBER, in her    )
25  individual capacity and in her official capacity )
      as Superintendent of the Campbell Union High )
26  School District; and OWEN HEGE, in his   )
      individual capacity and in his official capacity  )
27  as Principal of Westmont High School,    )
                                     )
28        Defendants.             )

AFFIDAVIT OF P.A. IN SUPPORT OF PLAINTIFF'S MOTION FOR P.I.

1      1.     My name is P.A., and I am the Plaintiff in this case. I am under eighteen years old

2  and currently attend Westmont High School ("WHS"). I am competent to testify and have personal

3  knowledge of the information contained in this affidavit.

4      2.     This affidavit is in addition to my sworn testimony included as part of the Verified

5  Complaint in this case.

6      3.     I am currently a senior at WHS.

7      4.     During my time at WHS, I have witnessed many students express their personal

8  beliefs in various ways at school.

9      5.     I have seen students wear t-shirts with religious, political, and other personal

10  messages on them.

11      6.     It is my understanding that students are allowed to hand out to other students

12  materials that express their beliefs.

13      7.     I have never witnessed a single disruption to the school's activities or to school

14  classes resulting from student speech at WHS.

15      8.     There are many recognized student clubs at WHS, some of which include the Gay

16  Straight Alliance, B-Buoy, Anime Club, Christian Club, Key Club, Culture Club, Color Talk, and

17  Link Crew.

18      9.     A true and accurate copy of a list of some of the recognized student clubs at WHS,

19  including a description of each's purpose, is attached as Exhibit A.

20      10.    True and accurate copies of documents containing information related to the Gay

21  Straight Alliance are attached as Exhibits A, D, and G to the Motion for Preliminary Injunction.

22      11.    True and accurate copies of documents containing information related to the Christian

23  Club are attached as Exhibit G to the Motion for Preliminary Injunction.

24      12.    True and accurate copies of documents containing information related to the Key

25  Club and Link Crew are attached as Exhibits A, E, and F, respectively, to the Motion for Preliminary

26  Injunction.

27

28

AFFIDAVIT OF P.A. IN SUPPORT OF PLAINTIFF'S MOTION FOR P.I.

13.     These recognized student clubs at WHS are granted rights, benefits, and privileges, and students of such clubs accordingly have the ability to express their beliefs and messages to other students.

14.     For example, students in other WHS student clubs can discuss their club with other students, have information about club meetings and activities conveyed over the morning P.A. announcements, and post materials on school bulletin boards about upcoming club events.

15.     Students in recognized clubs at WHS also can hand out flyers to other students advertising club meetings and activities, can freely choose a name for their club to convey the club's intended purpose, be listed on the WHS website (*see* Ex.A.), and have club meetings and activities announced on the WHS "Daily Bulletin" online (Ex. B (showing two non-curriculum related clubs, Anime Club and Color Talk, with access to the "Daily Bulletin" for purposes of advertising club meetings, etc.)).

16.     These benefits raise the profile of student clubs, attract members, and help these students express their messages to the student body.

17.     Because the Defendants completely shut me and other Pro-Life Club members out from the above-described rights and privileges, I deprived of any means of communicating with students.

18.     I was told by school officials that the Pro-Life Club could not be given any benefits or privileges because the club is "too controversial."

19.     I even asked to see copies of any policies, guidelines, or procedures related to student clubs, including club formation, but was denied all access to these documents.

20.     The purposes of students attending the Pro-Life Club are similar to the purposes of students of other clubs that are granted equal access to club benefits.

21.     For example, Gay Straight Alliance students meet regularly to discuss subjects concerning premarital sex, including homosexual behavior, addressing "anti-LGBT name-calling, bullying and harassment," and promoting "respect for ALL students" at WHS. (Ex. A at 1; D at 1; G at 2.)

AFFIDAVIT OF P.A. IN SUPPORT OF PLAINTIFF'S MOTION FOR P.I.

22.    I also desire to meet to address, from a religious perspective, issues related to premarital sex and promoting respect for all students at WHS.

23.    The students of Key Club meet regularly to discuss issues relating to community service, building character and leadership, focusing on the human and spiritual, rather than material, values of life, and daily living of the Golden Rule in all human relationships. (Ex. A at 1; E at 1-3.)

24.    In the same vein, I desire to discuss, from a religious viewpoint, community service, building character and leadership, spiritual, rather than material, values of life, and treating others as we would like to be treated, as the Golden Rule provides.

25.    The students of Link Crew meet regularly to discuss issues related to supporting and assisting freshman at WHS, including introducing them to support programs and campus life, and assisting them with any difficult issues and/or decisions they might confront in making the transition to the high school. (Exs. A at 1; F at 3.)

26.    I also want to discuss issues related to helping freshmen transition to the WHS environment, including providing support to them as they face difficult decisions and situations.

27.    The students of Christian Club meet to discuss issues related to faith and religion, embracing the Christian lifestyle, and providing positive experiences for students at WHS.

28.    In like manner, I also desire to discuss issues related to my Christian faith, including how best to embrace and foster Christian morals and beliefs, how to provide a positive experience for students at WHS by helping them make good choices, and assisting to create an environment at WHS where all human life is valued.

29.    I desire to receive all of the rights, benefits, and privileges given to other students of officially recognized student clubs.

30.    I also desire to immediately begin expressing my religious beliefs as they relate to premarital sex, community service, support for underclassmen, respect for others, and providing a positive experience for others, just to name a few, on equal footing as the students of the Gay Straight Alliance, Key Club, Christian Club, Link Crew, and other officially recognized non-curriculum clubs at WHS, without fear of being reprimanded, suspended, or similarly disciplined by school officials.

AFFIDAVIT OF P.A. IN SUPPORT OF PLAINTIFF'S MOTION FOR P.I.

## DECLARATION

I, P.A., verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this __10__ day of __January__, 2008, in Campbell, California.

_____P.A._____

P.A.

# EXHIBIT D

FAQs: About Student Organizing



**GLSEN**

faqs | library | news | donate now | about | search

news & announcements

## FAQs: About Student Organizing

Oct 17, 2005

### How does GLSEN work with students?

Since the first Gay-Straight Alliance (GSA) was started at the school where GLSEN's founder, Kevin Jennings, taught in Concord, Massachusetts in 1988, GLSEN has been the leader in supporting students who wish to combat bigotry based on sexual orientation and gender identity in their schools. GLSEN's Student Organizing department supports, trains and provides resources to student organizers and more than 3,000 GSAs currently registered with GLSEN.

We also invest and support the GLSEN National Student Leadership Team. This group of more than 70 middle and high schools students, selected through a rigorous application process, spend at least one school year on the leadership team building skills in order to support and facilitate safer schools efforts in their communities and nationwide.

### What is a GSA or Gay- Straight Alliance?

Gay-Straight Alliances (GSAs) are student-led clubs, usually at the high school or middle school level, that work to address anti-LGBT name-calling, bullying and harassment in their schools and promote respect for ALL students.

Although a lot of student clubs that are working to ensure safer schools are called GSAs, many clubs that support this work have different names like diversity clubs.

### Where do I find resources to start or support a GSA in my School?

Free resources are available to download on the Students section of the GLSEN website. These resources will give you practical information about how to start a GSA in your school and how to address issues that may come up along the way. When you register a GSA or other student club with GLSEN, you will receive free resources in the mail.

### RELATED DOCUMENTS



- A Quick-Reference Guide for Advisors of Gay-Straight Alliances/ Student Clubs (click here)

---

### ANNOUNCEMENTS  :: VIEW ALL

:: 2008 No Name-Calling Week Creative Expression Contest Winners Announced

:: Students Participate in Transgender Day of Remembrance to Raise Awareness, Educate

:: Michigan Students: Apply For Your State Campaign Advocacy Team!

:: GLSEN Outraged by Ann Coulter Downplaying Impact of Anti -Gay Slur

:: NASSP to Honor GLSEN Founder, Executive Director Kevin Jennings

---

Exhibit D - 1

1/10/2008

FAQs: About Student Organizing

What is GLSEN's National Student Leadership Team? How can I be on the team?

This team, made up of a core group of about 70 student organizers from all over the country, participates in leadership summits and events throughout the year. The team then works to support other students, educators and allies throughout the year in their efforts to ensure safer schools through various days of action, campaigns, trainings, summits and events.

The application process for the leadership team begins in April. All interested students who are at least 13 years of age and are going to be in a K-12 school in the upcoming year are encouraged to apply.

What is the Day of Silence?

The Day of Silence, a project of GLSEN in collaboration with the United States Student Association (USSA), is a student-led day of action where those who support making anti-LGBT bias unacceptable in schools take a day-long vow of silence to recognize and protest the discrimination and harassment -- in effect, the silencing -- experienced by LGBT students and their allies. For more information, free resources, and to register your school, visit **www.dayofsilence.org.**

What are GLSEN's other student projects and days of action?

GLSEN supports several days of action and projects throughout the year including the Day of Silence, Transgender Day of Remembrance, Voter Registration, local campaigns and a brand new event known as Ally Week. More information on each of these events can be found in the Student section of the GLSEN website and at **www.dayofsilence.org.**

Who can I contact for more information?

E-mail studentorganizing@glsen.org to be in direct contact with GLSEN's student organizing staff.

---

**DONATE TO GLSEN**

To help GLSEN achieve its vision of safe and effective schools for all students, consider the many benefits of a generous gift.

:: **Find Out More**

---

Register Your Gay-Straight Alliance - Events - BookLink - Media Center - Donate Now - About GLSEN

Contact Us - Employment Opportunities - Home

No Name-Calling Week - Day of Silence - Student Organizing

Questions or Comments? Write us at glsen@glsen.org or call us at 212-727-0135.

Exhibit D - 2

1/10/2008

FAQs: About Student Organizing

© 2003-2007 GLSEN, Inc., the Gay, Lesbian and Straight Education Network. All rights reserved.
Privacy Policy. Terms of Use.
Engineered by Mediapolis, Inc. . Designed by CDS Associates, Inc.

Exhibit D - 3

1/10/2008

http://www.glsen.org/cgi-bin/iowa/all/news/record/1876.html

# EXHIBIT E

home > about key club

**GUEST**

▸ ABOUT KEY CLUB
▸ **Key Club FAQ**
▸ **Objects of Key Club**
▸ **History of Key Club**
▸ **Care About Others**
▸ MEMBERSHIP INTEREST
▸ KIWANIS FAMILY LINKS

**MEMBER**

▸ MEMBER RESOURCES
▸ FORMS & LITERATURE
▸ SERVICE
▸ HOW TO BUILD A CLUB
▸ CONTESTS & AWARDS

**RELATED LINKS**

Key Club is the oldest and largest service program for high school students. What makes Key Club so successful is the fact that it is a student-led organization that teaches leadership through serving others. Members of the Kiwanis International family, Key Club members build themselves as they build their schools and communities.

Today, Key Club exists on more than 5,000 high school campuses, primarily in the United States and Canada. Growth efforts, however, have taken the Key Club experience internationally to Canada, the Caribbean nations, Central and South America, and most recently to Asia and Australia.

Key Club International is an organization of individual Key Clubs and is funded by nominal dues paid by every member. Its officers are high school leaders elected by the members at district and International conventions. The organization offers a wide range of opportunities to its members:

- Leadership development
- Vocational guidance
- College scholarships
- Subscription to the KEYNOTER magazine
- Service-learning
- Personal enrichment
- Value-added member benefit programs
- Liability insurance coverage

Originally, Key Club adopted as its motto, "We Build," the same motto as its parent organization, Kiwanis International. In 1976, the organization opted to change its motto to "Caring – Our Way of Life" because these words more clearly conveyed members' reasons for helping others.

*Key Club in Action Photos*



Spotlight 4 Sight Talent Show
Click the photo above to see more photos of local Key Club activities!

**Kicking HIV/AIDS Out of Kenya with UNICEF**



Click above to watch a video about how Key Clubbers are helping to fight HIV/AIDS.

**Other areas of interest:**
**Membership**
**Member Benefits**
**Keynoter Magazine**
**Key Club Service**
**Kiwanis Family Links**



GUEST: About Key Club | Membership Interest | Kiwanis Family Links | Search | Contact Key Club |
MEMBER: Member Resources | Forms & Literature | Service | How to Build a Club | Contests & Awards |
QUICK LINKS: District Information | Calendar | Kiwanis Family Store | Member Community | Keynoter Magazine | Kiwanis International Foundation |

KEY CLUB LINKS: Key Club International Convention | Partners |
HEADLINES: Current News | Archive News |

Copyright © 2008 Kiwanis International.

Exhibit E - 1

http://www.keyclub.org/about/                                          1/9/2008



home > about key club > objects of key club

GUEST



- ABOUT KEY CLUB
- **Key Club FAQ**
- **Objects of Key Club**
- **History of Key Club**
- **Care About Others**
- MEMBERSHIP INTEREST
- KIWANIS FAMILY LINKS



- MEMBER RESOURCES
- FORMS & LITERATURE
- SERVICE
- HOW TO BUILD A CLUB
- CONTESTS & AWARDS

RELATED LINKS

## Key Club Mission Statement, Vision, Core Values, Pledge, Motto, and Objects

**Mission Statement**

"Key Club is an international student-led organization which provides its members with opportunities to provide service, build character and develop leadership."

**Vision**

"To develop competent, capable, and caring leaders through the vehicle of service."

**Core Values**

The core values of Key Club International are leadership, character building, caring, and inclusiveness.

**Pledge**

I pledge, on my honor,
to uphold the Objects of Key Club International;
to build my home, school and community;
to serve my nation and God;
and combat all forces which tend to undermine these institutions.

**Motto**

Caring – Our Way of Life

**Objects**

- To develop initiative and leadership.
- To provide experience in living and working together.
- To serve the school and community.
- To cooperate with the school principal.
- To prepare for useful citizenship.
- To accept and promote the following ideals:
- To give primacy to the human and spiritual, rather than to the material values of life.
- To encourage the daily living of the Golden Rule in all human relationships.
- To promote the adoption and application of higher standards in scholarship, sportsmanship, and social contacts.
- To develop, by precept and example, a more intelligent, aggressive, and

Exhibit E - 2

serviceable citizenship.
- To provide a practical means to form enduring friendships, to render unselfish service, and to build better communities.
- To cooperate in creating and maintaining that sound public opinion and high idealism which makes possible the increase of righteousness, justice, patriotism, and good will.



Copyright © 2008 Kiwanis International.

GUEST: About Key Club | Membership Interest | Kiwanis Family Links | Search | Contact Key Club |
MEMBER: Member Resources | Forms & Literature | Service | How to Build a Club | Contests and Awards |
QUICK LINKS: District Information | Calendar | Kiwanis Family Store | Member Community | Keynoter Magazine | Kiwanis International Foundation |

KEY CLUB LINKS: Key Club International Convention | Partners |
HEADLINES: Current News | Archive News |

Exhibit E - 3

EXHIBIT F

## Westmont High School
## Accountability Report Card
## Reported for School Year 2004-05
### *Published During 2005-06*

**Notes regarding the source and currency of data:**

Data included in this School Accountability Report Card (SARC) template are consistent with State Board of Education guidelines, which are available at the California Department of Education Web site at http://www.cde.ca.gov/ta/ac/sa/definitions05.asp

Most data presented in this report were collected from the 2004-05 school year or from the two preceding years (2002-03 and 2003-04). Due to the certification timelines for graduation, dropout, and fiscal information, the data for these sections of the report were collected in 2003-04. Single-year column headings refer to the school year ending in that particular year. When no year is specified, data are from the most recent school year for which data are available.

More information about SARC requirements is available at the CDE Web site at http://www.cde.ca.gov/ta/ac/sa/, including a SARC Preparation Guide at http://www.cde.ca.gov/ta/ac/sa/guide.asp and Frequently Asked Questions at http://www.cde.ca.gov/ta/ac/sa/questions.asp.

# I. General Information

## Contact Information
Information about school and district contacts.

| School Information | | District Information | |
|---|---|---|---|
| School Name | Westmont High | District Name | Campbell Union High |
| Principal | Mr. Owen Hege | Superintendent | Dr. Rhonda E. Farber |
| Street | 4805 Westmont Ave. | Street | 3235 Union Ave. |
| City, State, Zip | Campbell, CA  95008-5725 | City, State, Zip | San Jose, CA   95124-2009 |
| Phone Number | (408) 378-1500 | Phone Number | (408) 371-0960 |
| FAX Number | (408) 379-1720 | FAX Number | (408) 558-3006 |
| Web Site | www.cuhsd.org | Web Site | www.cuhsd.org |
| E-mail Address | ohege@cuhsd.org | E-mail Address | rfarber@cuhsd.org |
| CDS Code | 43-69401-4338505 | SARC Contact | Mr. Terry Peluso |

## School Description and Mission Statement
Information about the school, its programs, and its goals.

Westmont High School (WHS), a California Distinguished School, is a vibrant, collaborative community whose team members continually strive to achieve the Campbell Union High School District (CUHSD) mission: "to provide a challenging learning environment enabling all students to achieve standards and expectations and to assume adult roles as positive, contributing citizens in a dynamic global society" (CUHSD Local Education Agency Plan 2003). Teachers, administrators, students, and parents participate in an ongoing examination of expectations,

standards, and achievement data in order to ensure students are prepared for the challenges they will face after high school. Collaboration days, built into the master calendar since 1999, facilitate the implementation of programs that foster mastery of state content standards – programs that make WHS the beacon of CUHSD.

Westmont High School, founded in 1964, is a four-year, comprehensive public high school. It is one of seven schools – five comprehensive and two alternative - that comprise the Campbell Union High School District. In 2005 WHS was named a California Distinguished School and in 1998 earned the prestigious distinction of National Blue Ribbon School. In 2001, WHS received a Digital High School grant. As a result of our 2003 WASC review, WHS developed the following Expected Schoolwide Learning Results (ESLRs): Personal Development, Individual and Group Communication, and Critical Thinking. In order to achieve these ESLRs, the faculty and staff of WHS are dedicated to featuring a student centered curriculum of knowledge and skills, focusing on the use of knowledge and skills in real world applications, and fulfilling the commitment to prepare students to thrive in a diverse society as well as in a competitive, global economy.

## Opportunities for Parental Involvement

Information about the contact person for parental involvement and a description of organized opportunities for parental involvement at the school.

| Contact Person Name | Mrs. Grace Tanaka | Contact Person Phone Number | (408) 378-1500 |
|---|---|---|---|

Westmont believes that parent volunteerism increases meaningful student contact with adults and contributes to school programs, facilities and equipment. There are many ways in which volunteers, parents and non-parents are involved in Westmont. There is an active PTSA on campus enhanced by several booster clubs, including Athletic, Agriculture, Music and Drama. Westmont volunteers donate more than 10,000 hours annually to assist and support the school.

# II. Demographic Information

## Student Enrollment -- Grade Level

Data reported are the number of students in each grade level as reported by the California Basic Educational Data System (CBEDS).

| Grade Level | Enrollment |
|---|---|
| Grade 9 | 455 |
| Grade 10 | 457 |
| Grade 11 | 467 |
| Grade 12 | 376 |
| Total Enrollment | 1755 |

## Student Enrollment -- Racial and Ethnic Subgroups

Data reported are the number and percent of students in each racial and ethnic subgroup as reported by CBEDS.

| Racial and Ethnic Subgroup | Number of Students | Percent of Students | Racial and Ethnic Subgroup | Number of Students | Percent of Students |
|---|---|---|---|---|---|
| African American | 53 | 3.0 | Hispanic or Latino | 322 | 18.3 |
| American Indian or Alaska Native | 4 | 0.2 | Pacific Islander | 7 | 0.4 |
| Asian | 256 | 14.6 | White (Not Hispanic) | 1,000 | 57.0 |

| Filipino | 15 | 0.9 | Multiple or No Response | 98 | 5.6 |
|----------|-----|-----|-------------------------|-----|-----|

# III. School Safety and Climate for Learning

## School Safety Plan
Information about the currency and contents of the school's comprehensive safety plan.

| Date of Last Review/Update | March 2004 | Date Last Discussed with Staff | March 2004 |
|----------------------------|------------|-------------------------------|------------|

All Campbell Union High School District schools have comprehensive safety plans that are updated, approved by the district's board of trustees and reviewed with school staff on an annual basis. These plans are compliant with federal standards and cover emergency, disaster, and incident procedures for the range of contingencies for which today's schools must prepare in order to assure the safety of students and staff. All school classrooms and workspaces have flipcharts with easy-to-read instructions for each of these contingencies. In addition, security officers are present on campus daily, badges are worn by employees, and our plans have been integrated with police, fire and health services procedures to assure a coordinated response at all times. With the help of police and emergency services departments, we run yearly drills with students and staff to practice preparedness, interagency communication, and rapid response. School safety plan updates are approved by the Board in March of each year and were reviewed with staff in March of 2004.

## School Programs and Practices That Promote a Positive Learning Environment
Information about the school's efforts to create and maintain a positive learning environment, including the use of disciplinary strategies.

A safe and productive learning environment that is focused on learning is promoted from the time new students join us as 9th graders. Before their 9th grade year begins, new students are introduced to the school, to its academic and support programs and to campus life by sophomores as a part of the Link Crew Program. We provide tutorial opportunities on a daily basis, academic counseling services and a full program of activities tied to academic areas. Along with athletics, a rich program of social activities and student government and leadership programs, we also provide social/emotional counseling when needed and conflict resolution counseling and training, so that students can fully focus on their studies.

## Suspensions and Expulsions
Data reported are the number of suspensions and expulsions (i.e., the total number of incidents that resulted in a suspension or expulsion). The rate of suspensions and expulsions is the total number of incidents divided by the school's total enrollment as reported by CBEDS for the given year.

|  | School | | | District | | |
|--|--------|--|--|----------|--|--|
|  | 2003 | 2004 | 2005 | 2003 | 2004 | 2005 |
| Number of Suspensions | 145 | 157 | 151 | 843 | 862 | 930 |
| Rate of Suspensions | 8.7 | 9.1 | 8.6 | 11 | 11.5 | 11.9 |
| Number of Expulsions | 17 | 16 | 15 | 68 | 67 | 67 |
| Rate of Expulsions | 1 | .9 | .85 | .9 | .9 | .9 |

# IV. School Facilities

## School Facility Conditions -- General Information
Information about the safety, cleanliness, and adequacy of school facilities, including the

# EXHIBIT G



December 2006
Issue 2

# WESTMONT PTSA

Westmont High School, 4805 Westmont Avenue, Campbell, CA  95008
Westmont.cuhsd.org  (408) 378-1500

## Principal's Message
By Owen Hege

Dear Westmont Families,

I would like to wish all members of the Westmont community a very peaceful and joyous holiday season!  May all our students enjoy a restful vacation period with their families.  When everyone returns on January 2 we will have two weeks in preparation for the first semester Final Exams.  The previous two progress grades will be replaced by a first semester final grade when the semester concludes on January 19.

There will be a change on your calendar as far as the 1st semester final exam schedule.  The schedule will now reflect three days of Final Exams.  On **January 16, 17, and 18** there will be two final exams of 2 hour length on each of the three days.  The exact schedule is displayed elsewhere in this newsletter.  **Students will begin Final Exams at 8:00 am and be dismissed at 12:20** daily.  Please make certain your students arrive early for the start of the exams.  The teachers believe that this schedule will allow them to provide a more meaningful exam for students and the best opportunity for student success.

During our staff development afternoons of October 9 and November 20, teachers worked together to improve learning in all subjects by developing skills in teaching "writing across the curriculum."  It is an established fact that students who express themselves by writing more frequently become higher level thinkers who can succeed in all subject areas.  All departments have made this an emphasis in their teaching areas.  During the collaboration mornings of December 5 and 6, school departments focused specifically on incorporating writing into their final exams.

I wish to congratulate all those students who participated so successfully in fall activities: athletics, marching band, speech and debate, Rhinoceros play production, Future Farmers activities, student leadership, and various individual club activities.  Although the varsity football team may not have been as successful in terms of total number of wins this year, there is no one who witnessed the final home game success on November 10 who could not share in the joy of the excitement in witnessing the team's final victory.  With all the excitement generated by players and student spectators that night, one would think that a championship had just been won.  Believe me, this is what it is all about and we are proud that our students were able to enjoy the moment.  Again, may you all have a wonderful holiday season!

## PTSA President's Message

By Mimi Hernandez

As the Holiday season quickly approaches we at Westmont's PTSA would like to wish you the merriest of seasons in the company of your loved ones, and continued prosperity in the coming year.

One of our goals this year at the PTSA is to reach out to all members of the Westmont Community. Westmont's student body today reflects the melting pot that is America.   As a result, parts of our newsletter will now also be printed in Spanish.   This will ensure we reach a higher percentage of parents and community members.

In addition to the Academic, Civic, Arts and Athletic boosters, Westmont has many other student clubs that embrace the different cultures and lifestyles of our student body—such as the Black Student Union, MEChA, Culture Club, Christian Club, and the Gay-Straight Alliance. The PTSA is happy to support all of these clubs that provide positive experiences, teach tolerance, and improve student relations and Westmont's atmosphere.

I would like to extend congratulations to our Drama department for their latest masterpiece, to the Speech and Debate kids who are working hard at having the last and best word on their competitions, to our unique Agricultural Department, to the most awesome Band and Colorguard, and to all our student athletes who bring sports here at Westmont to the next level. But most of all, a huge THANKS to all the parents who make it happen by giving of their time, effort and money.

Please continue to support Westmont with your time; it is the best investment you will ever make. We would like to invite you to join us for our PTSA next meeting.

## Mensaje De La  Presidenta

por Mimi Hernandez

Se aproxima la temporada festiva y los miembros de PTSA les quieren desearle una Feliz Navidad y propero Ano Nuevo.  Que la pasen en compania de sus seres queridos.  Una de nuestras metas este ano es alcanzar mas miembros de la comunidad. Como resultado parte de este Periodico estara traducido en espanol. Esto asegurara que todos esten al pendiente de los eventos en la escuela.

A parte de los clubs academicos, Civicos, atleticos o de arte La preparatoria Westmont tiene otros clubs que abrazan las diferentes culturas y tipos de vida del cuerpo estudiantil como Black Student Union, MEChA, Club cultural, Club Cristiano, Alianza de Gay o Straights. La organizacion de padres PTSA apolla estos club que contribullen experiencias positivas, ensenan tolerancia y mejoran la atmosfera y relaciones en nuestra escuela.

Tambien quiero felicitar a nuestro departmento de Drama en su ultimo exito, A los chicos de Speech and Debate por tener la ultima y mejor palabra, Agricultura por ser tan Unicos, La mejor Banda y Colorguard que tuvieron muy buena temporada. Pero mas que todo dar GRACIAS a los padres de familia por ayudar con su tiempo y dinero.

Por favor continue apollando a Westmont con su tiempo es la mejor inversion de su tiempo. Lo invitamos a nuestra proxima junta 01/02/2007 a las 7pm en la libreria.

> **Next PTSA meeting:**
> **January 2nd at 7 pm in the library.**